UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| H.O.P.E., INC., d/b/a HOPE FAIR HOUSING CENTER, an Illinois Not-for-Profit Corporation, ANDREW JOHNSON, CARRIE MASQUIDA, NANCY MASQUIDA, and OSVALDO MASQUIDA, <br><br> Plaintiffs <br> v. <br><br> LAKE GREENFIELD HOMEOWNERS ASSOCIATION, SCOTT HENDERSON, BERTRAND LUDDEN, TIM BIDUS, CHUCK RACHKE, and AL JACKMAN, <br><br> Defendants. | No. 16 CV 5422 <br><br> Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Andrew Johnson, Carrie Masquida, Osvaldo Masquida, and Nancy Masquida[1] (collectively, the Individual Plaintiffs) purchased vacant land in a housing development, on which they intended to build a residence. As an initial step, Plaintiffs planned to build an "outbuilding" (as the court understands it, a storage shed) on their property, and sought permission to do so from Defendants, the homeowners association and its board members. Plaintiffs allege that Defendants denied this request, though they had allowed other, non-Hispanic, residents to build similar outbuildings. Plaintiffs also complain that they were subjected to a different approval-seeking process and different requirements for obtaining permits for their planned residence. The Individual Plaintiffs, along with H.O.P.E. Fair Housing Center ("HOPE") have brought this suit for violations of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*, and the Civil Rights Act, 42 U.S.C. § 1982. Defendants have moved to dismiss the Fair Housing Act portion of the complaint for failure to state a claim. As explained below, the motion is denied.

---

[1] The court refers to the Individual Plaintiffs by their first names for clarity.

1

**BACKGROUND**

The allegations in Plaintiffs' amended complaint are presumed true for the purposes of this motion. *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011). Plaintiffs allege that Lake Greenfield Estates is a housing development in Gardner, Illinois. (Am. Compl. [20] ¶ 10.) In 2011, Plaintiffs Andrew Johnson and Carrie Masquida, who are married, purchased a 12.7 acre lot within Lake Greenfield Estates, known as Lot 15. (*Id.* at ¶¶ 8, 15.) They intended to build a residence where they would live with their children and with Carrie's parents, Plaintiffs Osvaldo and Nancy Masquida. (*Id.* at ¶ 15.) Osvaldo and Carrie are Hispanic; Osvaldo was born in Cuba and speaks with a "distinct accent." (*Id.* at ¶¶ 8–9, 18.)

After Andrew and Carrie purchased Lot 15, Osvaldo worked to clear the land, using a tractor to move large pieces of limestone, mowing the lawn with a riding mower, and planting and irrigating dozens of trees. (*Id.* at ¶¶ 21, 23, 25–27.) Andrew and Carrie wanted to build an outbuilding to store the tractor and mower, as well as the equipment and materials they would need to build the residence itself. (*Id.* at ¶¶ 21, 28.) Their non-Hispanic next-door neighbor had built a similar outbuilding before building a residence. (*Id.*)

In fact, many non-Hispanic neighbors had outbuildings on their property. (*Id.* at ¶ 20.) These neighbors had built their outbuildings and other improvements with the informal approval, or lack of objection, of Defendant Bertrand Ludden. (*Id.* at ¶¶ 16, 20.) Ludden was one of three developers who initially purchased the land that became Lake Greenfield Estates and established the Defendant Lake Greenfield Homeowners Association ("LGHA"). (*Id.* at ¶ 16.) Plaintiffs allege that Ludden himself "acted for the developers" by approving the improvements made by others who owned land in Lake Greenfield Estates (*id.* at ¶¶ 20, 29); the court assumes this means that Ludden acted on behalf of the LGHA.

Andrew and Carrie requested approval from Ludden to build their outbuilding, but Ludden refused. (*Id.* at ¶¶ 28–29.) Plaintiffs allege that Ludden assumed that Andrew and Carrie wanted to live in the outbuilding, "reflect[ing] Ludden's racial prejudice and stereotyping."

(*Id.* at ¶ 29.) Andrew and Carrie "decided not to press the issue" of the outbuilding and instead continued to pursue their overall plan of building a residence. (*Id.*)

Plaintiffs also allege that Osvaldo also experienced racial prejudice. On June 17, 2014, Defendant Al Jackman stopped Osvaldo as he was leaving the property with brush he had cleared from it. (*Id.* at ¶ 30.) Jackman asked Osvaldo where he got the trees that had been planted on Lot 15, implying, Plaintiffs believe, that Osvaldo was acted unlawfully. (*Id.*) Osvaldo asked Jackman, "Do you have an issue with me?" (*Id.*) Jackman responded by telling Osvaldo that he was the son of one of the developers. (*Id.*)

The LGHA had its first meeting on July 12, 2014. At that meeting, four individuals (Defendants Henderson, Jackman, Bidus, and Rachke) were "identified" to be the next board members of LGHA; they began serving sometime between August and December 2014. (*Id.* at ¶¶ 31, 36.) Prior to this meeting, the LGHA board members were the original developers, including Ludden. (*Id.* at ¶¶ 16, 19.) At the July 12 meeting, Andrew and Osvaldo "approached Ludden" and again requested permission to build an outbuilding before construction of a residence, as one of their neighbors had done. (*Id.* at ¶ 34.) After Andrew complained that they were being treated differently, Ludden orally approved their plan to construct an outbuilding. (*Id.*)

Another LGHA meeting took place on August 16. (*Id.* at ¶ 32.) One of the agenda items at that meeting was selection of "successors" to the Architectural Review Committee (ARC). The court is uncertain of the precise role played by the ARC, but it appears that it was involved in approving owners' plans for improvements to their land. Plaintiffs allege that "Ludden continued to act and represent himself as the ARC through at least December 2014." (*Id.* at ¶ 33.) At some point before July 2015, Henderson, Bidus, Rachke, and potentially others, began acting as the ARC. (*Id.* at ¶ 37.)

The Individual Plaintiffs proceeded with their plans to build an outbuilding and residence. They hired an architect and builder, and obtained a permit for the outbuilding. (*Id.* at ¶¶ 35, 38.)

On August 7, 2015, Defendants Henderson and Rachke approached Andrew and Osvaldo on Lot 15 "in a hostile manner" about the work being done—presumably construction of the outbuilding. (*Id.* at ¶ 41.) Andrew and Osvaldo told them that Ludden had approved the outbuilding, and Rachke acknowledged that if Ludden had approved it, "'there is nothing we can do' because Plaintiffs' project would be "'grandfathered in.'" (*Id.*) Rachke and Henderson then drove directly to Ludden's residence and remained there "for some time." (*Id.* at ¶ 42.)

Two days later, the ARC sent Andrew and Carrie an e-mail message denying that Ludden had approved the outbuilding plan. (*Id.* at ¶ 43.) Andrew unsuccessfully tried to contact Rachke and a lawyer who was noted as having received a copy of the e-mail. (*Id.* at ¶ 44.) On August 24, the Individual Plaintiffs received another e-mail from someone on the ARC (the name of the individual[s] who sent these messages is not stated), demanding that Plaintiffs provide proof in writing that they had approval to proceed with the outbuilding. (*Id.* at ¶ 45.)

Eventually, the LGHA (meaning presumably the new board members) required the Individual Plaintiffs to undergo a new approval process, though no non-Hispanic homeowners had been required to do so. (*Id.* at ¶ 46.) Andrew and Carrie did so, even though non-Hispanics were not required to use the new process. (*Id.*) This new process required Andrew and Carrie to provide significantly more information than non-Hispanics had been required to provide to construct their outbuildings. (*Id.* at ¶ 47.)

After the Individual Plaintiffs submitted their information, the ARC denied their request to build the outbuilding for the stated reason that the outbuilding would decrease Lake Greenfield Estates property values. (*Id.* at ¶ 48.) The refusal notice also cited the Lake Greenfield Estates Declaration of Covenants, Conditions, and Restrictions (which had been filed in 1995) as the basis for the decision, but Plaintiffs claim that those reasons are pretextual. (*Id.* at ¶¶ 48–49, 51.) Plaintiffs allege that other residents were allowed to construct similar outbuildings and to construct outbuildings before constructing a residence. (*Id.* at ¶¶ 51–53, 55.) Plaintiffs also

allege, without specifics, that LGHA did not adhere to the Illinois Common Interest Community Association Act. (*Id.* at ¶ 54.)

After rejecting their proposal, the LGHA also told Andrew and Carrie that they were required to purchase several permits within twelve months: (1) a primary home dwelling permit, (2) a water permit, and (3) a septic tank permit. (*Id.* at ¶ 56.) Non-Hispanic residents were not subject to this timing requirement, Plaintiffs allege. (*Id.*) They assert, further, that the permits would cost them thousands of dollars and that "the inconsistent, shifting, false and discriminatory demands and justifications of the HOA operated as a moving target and were untrustworthy and unacceptable." (*Id.*)

Plaintiffs claim that they needed to take steps to protect the materials and equipment already on their property, that their outbuilding permit expired, that it was "impractical and impossible" to construct anything on their property "without a court order or supervision by an impartial authority[,]" and that they felt unwelcome and fearful in Lake Greenfield Estates. (*Id.* at ¶¶ 57–59.) On November 10, 2015, Carrie filed a Charge of Discrimination in housing with the Illinois Department of Human Rights (IDHR). (*Id.* at ¶ 60.) In their response to the charge, Defendants asserted that "The Architectural Rules require that a residence be erected previously or concurrently with the erecting of any support or out buildings," though no such rules existed at the time. (*Id.* at ¶ 61.)

The Individual Plaintiffs contacted Plaintiff HOPE, and Plaintiffs filed this lawsuit on May 20, 2016. (*Id.* at ¶¶ 6, 62–63.) On May 22, 2016, the LGHA e-mailed homeowners, including the Individual Plaintiffs, the "first edition" of the ARC rules. (*Id.* at ¶ 64.) Plaintiffs allege that these rules "grandfather in" all buildings, variances, and covenant violations as of that date, "with the exception of that of the Plaintiffs[.]" (*Id.* at ¶ 65.) These rules also barred the use of materials that the Individual Plaintiffs had purchased for their outbuilding, prevented the use of their intended design for the outbuilding, and prohibited building an outbuilding before a residence. (*Id.* at ¶ 66.)

5

Plaintiffs filed an amended complaint on October 6, 2016. Plaintiffs allege three violations of the Fair Housing Act: In Count I, Plaintiffs allege that Defendants "made a dwelling unavailable to Plaintiffs and discriminated against them in the terms, conditions[,] and privileges of ownership" in violation of 42 U.S.C. § 3604. (*Id.* at ¶ 71.) Count II alleges that Defendants interfered with Plaintiffs' exercise or enjoyment of fair housing rights. Count III alleges that Defendants retaliated against Plaintiffs for exercising their fair housing rights. (*Id.* at ¶¶ 73, 75.) In addition to these claims, Plaintiffs allege that Defendants interfered with their right to enjoy and hold property (Count IV) and retaliated against them for exercising such rights (Count V), in violation of 42 U.S.C. § 1982. (*Id.* at ¶¶ 78, 80.) The Individual Plaintiffs claim to have suffered "loss of their civil rights, monetary losses, lost housing opportunity, emotional injury, humiliation and embarrassment[.]" (*Id.* at ¶ 68.) Plaintiff HOPE claims to have been "frustrated in its mission to eradicate discrimination in housing and in carrying out the programs and services it provides," all of which relate to fair housing, because its resources have been diverted from these services due to Defendants' conduct. (*Id.* at ¶¶ 69–70.)

Defendants have moved to dismiss the claims under the Fair Housing Act, Counts I–III, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The court has jurisdiction over this complaint because it alleges violations of Plaintiffs' fair housing and civil rights. 28 U.S.C. § 1331; *see also Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("[T]he only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.")

**DISCUSSION**

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "When analyzing the sufficiency of a complaint, [the court] construe[s] it in the light most favorable to the plaintiff, accept[s] well-pleaded facts as true, and draw[s] all inferences in the plaintiff's favor." *Davis*,

633 F.3d at 533. The court will not, however, accept "[t]hreadbare recitals of the elements of a cause of action" or "mere conclusory statements[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

I.      Definition of "Dwelling"

The Fair Housing Act makes it unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It is similarly unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." *Id.* § 3604(b). At the heart of Defendants' challenge to Plaintiffs' Fair Housing Act claims is the definition of "dwelling" under the Fair Housing Act. Defendants argue that because Plaintiffs' allegations concern the construction of an outbuilding not intended for residence, they have not stated a claim under any of these provisions of the Fair Housing Act.

The court disagrees. Under the Fair Housing Act, a "dwelling" is defined as

> any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, *and any vacant land which is offered for sale or lease for the construction or location thereon of any such building,* structure, or portion thereof.

42 U.S.C. § 3602 (emphasis added). "Dwelling," accordingly, can be an existing residence or vacant land on which a residence will be constructed. Thus, the outbuilding, which was never intended to be a residence, is not a dwelling. Plaintiffs intend, however, to build a residence on the vacant land, and it is clear that the lot was offered for sale for that reason. (*See* Am. Compl. ¶¶ 15–16, 19–20, 22, 29, 31–32.) This vacant land, accordingly, is property subject to protection of the provisions of the Fair Housing Act.

Moreover, as Plaintiffs note, the outbuilding "was merely a step in the process of constructing their home." (Pls.' Resp. in Opp. to Defs.' Mot. to Dismiss Counts I–III of Pls.' Am. Compl. [30] 10.) The outbuilding itself should therefore be considered at least part of a

7

"dwelling," they contend."[2] This argument may have merit; drawing inferences in favor of Plaintiffs, they have plausibly alleged that they needed to construct an outbuilding, as their neighbors had done, in order to get the larger residence built, but Defendants' conduct effectively made that plan unavailable to them. The court need not address the "outbuilding" dispute further, however. Plaintiffs' vacant land can constitute a "dwelling" for purposes of the Act, and they have alleged that, on the basis of Plaintiffs' national origin, Defendant interfered with their right to enjoy it. Defendants' motion to dismiss on this basis is denied.

## II. Count I: Section 3604

In Count I, Plaintiffs allege violations of 42 U.S.C. § 3604(a) and § 3604(b). As noted, section 3604(a) prohibits refusal

> to sell or rent after the making of a bona fide offer, or refus[al] . . . to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604. For a dwelling to be "otherwise [made] unavailable or den[ied]" to a plaintiff, the defendant's actions must be akin to constructive eviction. *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009). "[I]t is well-understood that constructive eviction requires surrender of possession by the tenant." *Id.* at 778.

---

[2] Plaintiffs cite a number of cases covering "an extremely wide spectrum of activities" related to housing in support of their contention that discrimination related to construction of an outbuilding (as opposed to a building intended for residence) is covered by 42 U.S.C. § 3604. These cases do confirm the broad protection afforded by the Fair Housing Act, though all do address impediments to purchasing, renting, or occupying *residential* buildings or vacant land, rather than buildings ancillary to residences. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2514 (2015) (concerning allocation of tax credits to build affordable residential housing); *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 894 (7th Cir. 1996), *as amended* (Aug. 26, 1996) (concerning handicapped-accessible parking space outside plaintiff's residence); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1286 (7th Cir. 1977) (concerning a zoning designation that would allow the construction of racially integrated residences); *Lopez v. City of Dallas*, No. 3:03-CV-2223-M, 2004 WL 2026804, at *1 (N.D. Tex. Sept. 9, 2004) (zoning designations, city pollution practices, and city's refusal to provide flood protection prohibited construction of dwellings); *Lauer Farms, Inc. v. Waushara Cty. Bd. of Adjustment*, 986 F. Supp. 544, 559 (E.D. Wis. 1997) (migrant worker camp structures were "dwellings" because people expected to reside in them); *McHaney v. Spears*, 526 F. Supp. 566, 568 (W.D. Tenn. 1981) (concerning the purchase of vacant land on which the plaintiffs wanted to build a residence).

The dwelling at issue is vacant land, which the Individual Plaintiffs already owned; nobody refused to sell it to them. There is also no allegation that preventing the construction of an outbuilding or instituting rigorous permitting requirements rises to the level of constructively evicting the Individual Plaintiffs from their land. Plaintiffs allege that "it was impractical and impossible for Plaintiffs to proceed with steps towards constructing their buildings on their property without a court order or supervision by an impartial authority" (Am. Compl. ¶ 59), but the only thing that actually impeded their building plans was the alleged requirement that they acquire various permits within twelve months. (*Id.* at ¶ 56.) As Plaintiffs intended to construct a home on a very large lot, it seems unlikely that the costs of the permits would have prevented them from moving forward. Plaintiffs do allege that they were prohibited from building an outbuilding, but that prohibition does not make their dwelling (the vacant land itself or the residence to be constructed there) unavailable to them.[3]

Plaintiffs have also invoked § 3604(b), however, which makes it unlawful

> [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604. In *Bloch*, the plaintiffs agreed to be governed by a condominium association when they bought their condominium units. *Bloch*, 587 F.3d at 779. The court held that "because the Blochs purchased dwellings subject to the condition that the Condo Association can enact rules that restrict the buyer's rights in the future, § 3604(b) prohibits the Association from discriminating against the Blochs through its enforcement of the rules, even facially neutral rules." *Id.* at 780.

That language is instructive here. Although not explicitly alleged, it appears that the Individual Plaintiffs bought their land subject to the regulations of the Lake Greenfield Homeowners Association. (*See* Am. Compl. ¶¶ 10, 15–16, 28–29, 31–34, 36–37, 41, 43–49,

---

[3] As explained above, Plaintiffs' citation to a number of cases concerning a variety of behaviors relating to the construction, renting, or sale of either residences or vacant land does not indicate whether the outbuilding itself is a dwelling.

9

51–54, 56.) Plaintiffs allege that the Defendants changed or rewrote the rules of the HOA specifically to prevent them from using their land as they planned. If true, that is discrimination in the privilege of sale of the vacant land itself, which is a dwelling under the FHA. This states a claim for violation of § 3604(b), so the motion to dismiss is denied with respect to Count I.

### III. Counts II and III: Section 3617

Counts II and III both allege violations of 42 U.S.C. § 3617, but each count concerns different alleged conduct. 42 U.S.C. § 3617 makes it unlawful

> to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604 . . . of this title.

42 U.S.C. § 3617. "To prevail on a § 3617 claim, a plaintiff must show that (1) she is a protected individual under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate." *Bloch*, 587 F.3d at 783.

In Count II, Plaintiffs claim that they were exercising their rights to construct an outbuilding and residence on their land, and that Defendants interfered with these rights by refusing to allow them to build the outbuilding and by subjecting them to a different approval process and permitting requirements than other residents. Count III is akin to a traditional retaliation claim; Plaintiffs claim that they exercised fair housing rights by complaining to the Defendants that they were being treated differently and by filing a Charge of Discrimination with the Illinois Department of Human Rights. Plaintiffs allege that Defendants interfered with these rights by various retaliatory actions: enforcing purported LGHA requirements not imposed on other homeowners, barring the Individual Plaintiffs from constructing their desired outbuilding and using certain materials, and enacting rules directed at them.

### A. Count II

HUD regulations interpreting § 3617 show that the prohibited conduct includes "interfering with persons in their *enjoyment of a dwelling*[,]" 24 C.F.R. § 100.400(c)(2) (emphasis added), without looking to the particular conduct prohibited by § 3604. Though the Seventh Circuit has not found this regulation controlling, it has afforded it "great weight." *Bloch*, 587 F.3d at 782 (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 210 (1972); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 300 (7th Cir. 1992)). Interfering with the process of constructing a residence, or an outbuilding, on vacant land would interfere with the enjoyment of the land, which, as explained above, is a dwelling under the FHA.

But even without considering this regulation, a defendant can "interfere" with the enjoyment of a plaintiff's § 3604 rights while the plaintiff remains on the property. *See id.* at 781–82 (7th Cir. 2009). "Though § 3604 requires that the plaintiffs' dwelling be made truly unavailable, or that defendants deprived plaintiffs of their privilege to inhabit their dwelling, the text of § 3617 is not so limited." *Id.* at 782. As the Seventh Circuit put it: "if a landlord rents to a white tenant but then threatens to evict him upon learning that he is married to a black woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not." *Id.*

Plaintiffs in this case allege that Defendants told them that they must acquire certain permits within a limited time period, and prohibited them from constructing their desired outbuilding. If Plaintiffs were unable to comply with LGHA's directions, they would be deprived of the enjoyment of their land. And if they are able to comply, they may still have a claim; "*attempted* discriminatory evictions can violate § 3617's prohibition against interference with § 3604 rights." *Id.* (emphasis in original).

In *Bloch*, moreover, the Seventh Circuit allowed a § 3617 claim for interference with FHA rights when the plaintiffs already resided in a dwelling. *See id.* at 781–85. Contrary to Defendants' argument, the fact that the Individual Plaintiffs here already own the vacant land

thus does not bar a claim under § 3617. Accordingly, Count II states a claim for violation of 42 U.S.C. § 3617.

### B. Count III

Defendants attack Count III on a separate ground: that there are insufficient allegations of protected activity. Again, the court disagrees. Plaintiffs have alleged that they (1) complained directly to Defendants about unequal treatment and (2) made a complaint to the Illinois Department of Human Rights. HUD regulations characterize retaliation for both such actions as unlawful under § 3617. 24 C.F.R. § 100.400(c)(4) to (6). The Seventh Circuit has implicitly allowed complaints alleging retaliation under § 3617 where the protected activity consisted of complaints to an association, *Mehta v. Beaconridge Improvement Ass'n*, 432 F. App'x 614, 615, 617 (7th Cir. 2011), and complaints to a legal authority, *Herndon v. Hous. Auth. of S. Bend*, ___ Fed. App'x ___, No. 16-2821, 2016 WL 6682101, at *2 (7th Cir. Nov. 14, 2016). Plaintiffs have therefore adequately alleged protected activity, and the motion to dismiss is denied with respect to Count III.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss [23] is denied.

ENTER:

Date: April 26, 2017

_____
REBECCA R. PALLMEYER
United States District Judge