UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| H.O.P.E., INC., d/b/a HOPE FAIR HOUSING CENTER, an Illinois Not-for-Profit Corporation, ANDREW JOHNSON, CARRIE MASQUIDA, NANCY MASQUIDA, and OSVALDO MASQUIDA, <br><br> Plaintiffs, <br><br> v. <br><br> LAKE GREENFIELD HOMEOWNERS ASSOCIATION, SCOTT HENDERSON, BERTRAND LUDDEN, TIM BIDUS, AL JACKMAN, and CHUCK RACHKE, <br><br> Defendants. | No. 16 C 5422 <br><br> Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

Defendant Lake Greenfield Homeowners Association (the "Association") has authority to control construction in a housing development in Grundy County, Illinois. Plaintiff H.O.P.E., Inc. is an Illinois non-profit corporation that advocates for persons who claim unlawful housing discrimination. In this lawsuit, H.O.P.E. alleges that the Association has exercised its authority in a biased or retaliatory fashion against the individual Plaintiffs, two of whom are of Hispanic ancestry. The individual Plaintiffs purchased a vacant lot in the subdivision known as Lake Greenfield Estates, and proposed to build a small "outbuilding" for the purpose of storing the equipment they would need to construct a residence on the property. Multiple white property owners in the subdivision had received permission to construct similar outbuildings prior to building homes on their lots, but Defendants—the Association and certain members of its "Architectural Committee" and Board of Directors—denied such permission to the individual Plaintiffs. Plaintiff Carrie Masquida filed a charge of discrimination with the Illinois Department of Human Rights, and the Architectural Committee subsequently adopted rules that, among other things, prohibit the construction of "outbuildings" prior to residences. Plaintiffs then filed suit in

this court, alleging violations of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1982. Defendants have moved for summary judgment. For the reasons explained here, Defendants' motion is granted in part and denied in part.

## BACKGROUND

### I. Governance of Lake Greenfield Estates

Lake Greenfield Estates is a residential subdivision located in Grundy County, Illinois, approximately 50 miles southwest of Chicago. The subdivision dates to July 1995, when PBR Real Estate Development Company, LLC imposed a "Declaration of Covenants, Conditions, Restrictions, Reservations, Equitable Servitudes, Grants and Easements" (hereafter "Covenants") on a 320-acre parcel it owned surrounding a small lake. (Covenants 1, Ex. 1 to Defs.' Statement of Facts (hereafter "DSOF") [63].) These Covenants remained in effect throughout the time period relevant to this lawsuit. (DSOF ¶ 13.)

The Covenants were imposed for the purpose of ensuring "that the property will be developed as a desirable private exclusive rural residential living area." (Covenants 1.) Under the Covenants' terms, PBR Real Estate would divide the 320-acre parcel into no more than 75 lots, each having "access to the common area lake." (*Id.*) Purchasers of these lots would be limited to constructing one single-family home on each lot. Each home would be required to have at least 1850 square feet of "living area", not including garages, basements, and porches. (*Id.* at 1, 8-9.)

Section 4 of the Covenants outlined a series of prerequisites for the construction or reconstruction of "any building fence, dock, boat lift, or improvement whatsoever." (*Id.* at 5.) These prerequisites included submission of "two (2) complete sets of construction plans," as well as a detailed "site plan," for approval by an "Architectural Committee." (*Id.* at 5-6.) This Committee had broad discretion to approve or disapprove of the plans based on factors such as the "acceptab[ility]" and "suitab[ility]" of the proposed materials and color scheme, as well as the Committee's subjective beliefs about whether the proposed structure would "depreciate or

2

adversely affect the values of other buildings sites or building in the development." (*Id.* at 8.) PBR Real Estate would retain control over the Architectural Committee until July 2015, at which point membership on the Committee would be determined by a majority vote of land owners in the subdivision. (*Id.* at 6.)

Section 5(c) of the Covenants addressed the permissibility of non-residential "outbuildings," such as free-standing garages and tool sheds. Specifically, this section stipulated that "[n]o outbuilding may exceed 1,200 square feet," and that each outbuilding's "roof line and architectural style shall conform to the construction standards and general architectural appearances of the dwelling structure." (*Id.* at 9.) Section 5(c) also stated that "[a]ny outbuildings proposed to be erected must be approved by the Architectural Committee." (*Id.*)

The record shows that on several occasions, the Architectural Committee declined to rigidly enforce the rules governing construction of outbuildings. In 2004, for example, the Committee—through Defendant Bertrand Ludden, a member of PBR Real Estate who led[1] the Architectural Committee from its inception through July 2015—gave verbal approval to Donald Crater to construct an outbuilding prior to building a residence on the same lot, and to construct that outbuilding with metal and wood even though the residence would be built of brick and wood. (Crater Dep. 8, 23-24, Ex. 2 to PSOF.) At some point (neither party says when), Ludden also gave Defendant Tim Bidus permission to build a detached garage that occupies approximately 1,400 square feet—nearly two hundred square feet more than the 1,200 square-foot limit set in the Covenants. (PSOF ¶ 66; Defs.' Resp. to PSOF ¶ 66; Bidus Dep. 19, Ex. 1 to PSOF.) And in 2016, Defendant Chuck Rachke constructed a garage on his property that is, according to a building permit Rachke signed and filed with Grundy County, approximately 1,300 square feet in area. (PSOF ¶ 71; Defs.' Resp. to PSOF ¶ 71.) Crater, Bidus, and Rachke are all white and/or

---

[1] Although the record is not clear on this point, some evidence suggests that Ludden was the *only* member of the Architectural "Committee" during this period. Defendant Chuck Rachke described the Committee as a "position" at his deposition, and stated that Ludden "was acting as that position." (Rachke Dep. 26, Ex. 14 to PSOF.)

"non-Hispanic." (Johnson Dep. 19, Ex. 8 to PSOF; Osvaldo Masquida Decl. ¶ 4, Ex. 28 to PSOF; Defs.' Resp. to PSOF ¶ 74.)

Rachke himself has been a member of the Architectural Committee since July 2015, when Defendant Ludden and the other members of PBR Real Estate assigned their interests in Lake Greenfield Estates to Defendant Lake Greenfield Homeowners Association. (DSOF ¶ 23; Second Am. Decl. for Lake Greenfield Estates, Ex. B to Defs.' Resp. to PSOF.) Ludden had previously approached Rachke, in approximately 2013 or 2014, and invited him to become involved with the Association and to serve on the Architectural Committee. (Rachke Dep. 25-26.) Ludden also approached two other residents of the subdivision, Defendants Scott Henderson and Tim Bidus, and asked them to serve on the Association's Board of Directors. (Henderson Dep. 10-11, Ex. 3 to PSOF.) At a Board meeting on July 17, 2015, Defendant Bidus was elected President of the Association, Defendant Henderson was elected Vice President, Defendant Rachke was elected Secretary, and Defendant Al Jackman was elected Treasurer.[2] (Minutes of July 17 Meeting, Ex. C to DSOF.) At the same meeting, the Board nominated Rachke, Henderson, and someone named Dean Cunning (who is not a party here and whom neither party identifies) to serve on the Architectural Committee. (*Id.*)

II.  **Plaintiffs' Attempts to Develop Property in Lake Greenfield Estates**

Plaintiffs Carrie Masquida and Andrew Johnson met in Chicago in 2005. (Carrie Masquida Dep. 5, 18.) They married in 2009, had at least two children (the record is unclear on the exact number), and developed a close relationship with Carrie's parents, Plaintiffs Osvaldo ("Ozzie") and Nancy Masquida, who lived in Gardner, Illinois, a few miles northwest of Lake Greenfield Estates. (C. Masquida Dep. 5, 10,18; Johnson Dep. 15, 95.) Carrie and Andrew visited the area frequently, as a "getaway" from their residence "downtown." (Johnson Dep. 15.) Andrew became particularly close to his father-in-law Ozzie, a boisterous Cuban immigrant who loves to waterski

---

[2] Defendant Jackman is the son of Robert Jackman, one of PBR Real Estate's three members. (DSOF ¶ 6; Covenants 23.)

4

barefoot. (C. Masquida Dep. 13; Johnson Dep. 19, 95, 99; Ozzie Masquida Dep. 16, Ex. 12 to PSOF.) Carrie—who "strongly and openly identifies as Cuban" and drives a car with the license plate "Cubana"—often suggested to Andrew that they move to the area around Gardner and build a house where they and Carrie's parents could live together. (PSOF ¶ 103; C. Masquida Dep. 18; Johnson Dep. 96.)

In 2011, Carrie and Andrew paid approximately $150,000 for a vacant, 12.7 acre lot in Lake Greenfield Estates that includes 800 feet of lake frontage. (C. Masquida Dep. 18.) A man named Ron Chovan owned the lot at the time, and Carrie and Andrew made their offer on Chovan's property through a realtor named Doug Geisler. (*Id.* at 19-20.) Nothing in the record suggests that PBR or any of the Defendants in this case were involved in the transaction in any way.

At some point prior to November 2012, Carrie, Andrew, and their children moved to Arizona. (Johnson e-mail to Ludden, Nov. 11, 2012, Ex. D to DSOF.) (The record does not disclose exactly when, or why, the family moved.) In their absence, Ozzie began working to improve the lot in Lake Greenfield Estates.[3] He recalls "pick[ing] up all the debris that the previous owner have [sic] left behind," picking up "every single rock on 12 acres," cutting the grass, "mov[ing] big boulder rocks in strategic places so it will look nice," and "plant[ing] trees," among other tasks. (O. Masquida Dep. 25-26.) Andrew and Carrie purchased "a backhoe with a bushwhacker" to assist Ozzie with his work, as well as a water tank, a "grasshopper" riding mower, a small four-wheel-drive utility vehicle, and "tools like rakes and post drivers." (*Id.* at 27.)

---

[3] The parties offer very different descriptions of the lot's condition at the time Carrie and Andrew purchased it. According to Defendant Henderson, the previous owner "had cleared the area for a home site, installed underground electric service, installed a long paved and tree-lined driveway, and had built a dock, gazebo and waterfall." (Henderson Decl. ¶ 1, Ex. A to Defs.' Resp. to PSOF.) Plaintiffs maintain, and Ozzie Masquida has testified, that the lot was "rough, undeveloped, and was previously used for strip mining." (PSOF ¶ 4.)

5

In November 2012, Andrew Johnson wrote an e-mail to Defendant Ludden requesting permission to construct a 1000-square-foot storage building on the property. (Johnson to Ludden, Nov. 11, 2012, Ex. D to DSOF.) Johnson promised in this e-mail that the building would "only have one use—storage." (*Id.*)[4] He explained that the building would be "similar to what Donny Crater has built," would be located on "the far east side of the property away from the lake," and would not be connected to any electrical, water, gas, or other utilities. (*Id.*) Johnson's message noted that, although he and his family were living in Arizona, it was "only a matter of time that my wife and I will be building a home on the property," because "[o]ur intention is for [their children] to have a 'lake place' to grow up and for our family to enjoy for a long time." (*Id.*) Johnson concluded the e-mail by offering to discuss his request further, and by inviting Ludden to contact him or Ozzie Masquida by phone. (*Id.*)

The parties agree that Ludden denied Johnson's November 2012 request, but they dispute what else Ludden said to Johnson. Johnson has testified that Ludden "stat[ed] that he didn't want me or my family living in the building." (Johnson Dep. 52.) Defendants deny that Ludden mentioned Johnson's family or anyone other than Johnson himself. (Defs.' Resp. to PSOF ¶ 23.) Defendants maintain that no "buildable plans" for the outbuilding or for a residence were attached to Johnson's e-mail, though they do not suggest that Ludden specifically asked Johnson for such plans. (DSOF ¶¶ 15-16.) Johnson later wrote that he was "puzzled" by Ludden's decision, but "respectfully shelved the project" anyway. (Johnson to Lake Greenfield Homeowners Association, Aug. 15, 2015, Ex. 16 to PSOF.)

At some point during the next two years, Johnson returned to Illinois from Arizona. (*Id.*) It is not clear exactly when or why Johnson returned, or how long he remained in Illinois.

---

[4] The letter suggests prior communications between Johnson and Ludden: it refers to Ludden's "concerns about allowing a building to be built and having it become something other than the intended use." But neither party identifies exactly what the two men had discussed. Ludden himself does not remember any conversation with Johnson about the outbuilding prior to receiving the e-mail request from him in November 2012. (Ludden Dep. 23.)

6

According to Johnson, he "continue[d] to improve and care for" the property in Lake Greenfield Estates during this time, and "continue[d] to invest in Lake Greenfield as a whole." (*Id.*)

In July 2014, Johnson and Ozzie Masquida approached Ludden after a homeowners' association meeting at Ludden's house and again asked Ludden for permission to construct an outbuilding on Johnson's property. (*Id.*) The parties dispute what Ludden said in response. According to Plaintiffs, Ludden gave Johnson and Ozzie verbal permission to proceed, provided they followed "a build schedule similar to that of Donny Crater." (*Id.*; PSOF ¶¶ 25-26.) Plaintiffs do not say exactly what this "build schedule" would have involved, but some evidence suggests it meant that Johnson would begin construction of a residence on the property within one year of completing the outbuilding. (*See* Johnson e-mail to Lake Greenfield Homeowners Association, Aug. 15, 2015.) Defendants deny that Ludden ever gave Johnson permission to construct the outbuilding. (Defs.' Resp. to PSOF ¶¶ 25-27.)

After "several months of planning," Johnson began construction of the outbuilding. (Johnson Dep. 56.) On July 16, 2015, he received a building permit for the structure from Grundy County. (*Id.*) Around the same time, he paid a contractor named Keith Schubert "somewhere between $20,000 and $25,000" for building materials and labor. (*Id.* at 55-56.) Ozzie continued to work on the property, and at some point he was confronted and "interrogated" about what he was doing on the property by Defendant Al Jackman. (O. Masquida Dep. 31.)

On August 7, 2015, Johnson and Ozzie Masquida were working on the property when Defendants Rachke and Henderson approached them. Both Rachke and Henderson had recently been appointed to Lake Greenfield's Architectural Committee, as described above. After introducing themselves as representatives of the Lake Greenfield Homeowners Association's Board of Directors, Henderson and Rachke directed Johnson and Ozzie "to stop everything, stop all the work." (O. Masquida Dep. 40.) Ozzie recalls that Rachke and Henderson "came with a vengeance" and "were very confrontational." (*Id.*) Johnson characterizes Rachke and Henderson's "affect" as "threatening," though the only evidence he offers is that Henderson stood

7

with his arms crossed and refused to look at Johnson. (Johnson Dep. 49.) According to Johnson, he and Ozzie told Henderson and Rachke that Ludden had approved their request to construct an outbuilding the previous year. (*Id.* at 48-49.) Rachke responded that the outbuilding "would be grandfathered in" if this were true, but that construction could not proceed until the Architectural Committee verified Ludden's alleged approval. (*Id.* at 50.)

On August 10, 2015, someone purporting to speak for the Architectural Committee sent an e-mail to Johnson. This e-mail denied that Ludden had ever approved construction of an outbuilding on Johnson and Masquida's property[5] and stated that "no 'Grandfather Policy' applies." (Architectural Committee to Johnson, August 10, 2015, Ex. 19 to PSOF.) The e-mail also advised Johnson that future approval of the outbuilding would be "contingent upon obtaining a permit for the residential dwelling," stated that "[t]he plans submitted to date are not sufficient to obtain approval," and "request[ed] that no construction activities continue until the committee grants approval." (*Id.*)

Johnson made several attempts to meet the Architectural Committee's demands. In exchange for permission to move forward with the outbuilding, he first offered to "expedite the building permit process" for the residence he intended to construct after the outbuilding was complete. (Johnson to Architectural Committee, Aug. 14, 2015, Ex. 16 to PSOF; Johnson Dep. 66.) Scott Henderson then requested "complete plans" for the outbuilding, including "all dimensions, roof pitch, and materials." (Henderson to Johnson, Aug. 15, 2015, Ex. 16 to PSOF.) Johnson responded with "truss drawings for the outbuilding." He also "identified the building orientation [and] identified the colors and described the planned landscaping," and explained that

---

[5] According to Rachke, Ludden told Rachke that he "absolutely [did] not" give Johnson and Masquida verbal approval to construct an outbuilding. (Rachke Dep. 36, Ex. H to DSOF.) Although Ludden appears to have testified at his deposition about his July 2014 discussion with Johnson and Masquida, the brief excerpts of the transcript provided by the parties do not include testimony about whether Ludden did or did not approve Johnson and Masquida's request. (*See* Ex. 9 to PSOF.)

8

he had "taken steps forward with the septic system and water extraction system," so as to "speed up the dwelling permit process." (PSOF ¶¶ 45-46; Defs.' Resp. to PSOF ¶¶ 45-46.)

Two days later, Henderson informed Johnson that "we want to get more facts before making a decision," and asked Johnson to provide blueprints for the outbuilding and "an updated site plan" showing setbacks from the property line. (Henderson to Johnson, Aug. 17, 2015, Ex. 16 to PSOF.) Johnson responded the same day with blueprints and "a satellite image reflecting the appropriate side yard setback." (PSOF ¶ 48; Defs.' Resp. to PSOF ¶ 48.) On August 24, someone from the Architectural Committee sent Johnson an e-mail informing him that the Committee would "need to see exterior renderings/elevations of the house prior to giving any approval for the outbuilding," and warning that the Committee "may have more questions or requests for additional documents" in the future. (Architectural Committee to Johnson, Aug. 24, 2015, Ex. 16 to PSOF.) Again, Johnson responded promptly, furnishing the Committee with documents four days later that showed "the exterior elevation and updated floor plan." (Johnson to Architectural Committee, Aug. 28, 2015, Ex. 16 to PSOF.)

The Committee remained unsatisfied and continued making requests for information into September. On September 2, someone from the Architectural Committee sent an e-mail to Johnson requesting "a copy of [Johnson's] plat with all building footprint/locations, driveways, setbacks and utilities shown." (Architectural Committee to Johnson, Sept. 2, 2015, Ex. 16 to PSOF.) This e-mail also asked Johnson to specify "the exterior materials and color of the house," the "color of the trim and windows of the house," the "color of the outbuilding doors," and the "pitches of the house roof lines," as well as any plans for landscaping around the outbuilding. (*Id.*) Once again, Johnson responded immediately. On the same day that he received the request, Johnson sent a "plat image" to the Committee. (Johnson to Architectural Committee, Sept. 2, 2015, Ex. 16 to PSOF.) He also provided all of the requested information about the appearance and materials of the residence, except for plans relating to landscaping around the outbuilding. (*Id.*) The next day, the Committee asked for additional details, such as whether there were

9

already transformers and meters on the property, and if so, where those transformers and meters were located. (Architectural Committee to Johnson, Sept. 3, 2015, Ex. 16 to PSOF.) Johnson again provided all this information later the same day. (Johnson to Architectural Committee, Sept. 3, 2015, Ex. 16 to PSOF.)

Later that month, however, Johnson's patience appears to have run out. Henderson called Johnson on September 11 and requested that Johnson reduce the height of the proposed outbuilding by two feet, use "stone wainscotting" on the outbuilding instead of "metal wainscotting," install evergreens at least six feet tall around the perimeter of the outbuilding, and post a "paid performance bond . . . to assure construction of the residence." (PSOF ¶¶ 53-56; Johnson to Architectural Committee, Sept. 11, 2015, Ex. 16 to PSOF.) Johnson told Henderson that he would not agree to these terms. (Johnson to Architectural Committee, Sept. 11, 2015.)

On September 15, 2015, the Committee informed Johnson that it would not approve the outbuilding in the form Johnson had proposed. (Architectural Committee to Johnson, Sept. 15, 2015, Ex. 20 to PSOF.) The Committee offered the following reasons for its disapproval, citing sections 5(c) and 4(d) of the Covenants: the proposed outbuilding and residence were "incompatible and not of the same architectural style"; there were "no materials incorporated in the pole barn that are consistent with the main dwelling"; and the existence of a free-standing "pole barn" without a residence on the same lot would "adversely affect property values in Lake Greenfield Estates." (*Id.*) The Committee concluded by advising Johnson that he could "re-submit the plans for further reconsideration if the proposed construction is modified in accordance with the Committee's recommendations." (*Id.*)

Their direct negotiations having failed, both Johnson and the Homeowners Association obtained legal counsel. On October 5, 2015, Johnson, through his attorney, offered to "perform a soil investigation and apply for water and septic permits within six (6) months after completion of his outbuilding" in exchange for the Committee's approval of the outbuilding in the form he had proposed. (Michael T. O'Connor to David A. Kolb, Oct. 5, 2015, Ex. P to DSOF.) The

10

Homeowners Association responded with a counteroffer: the Association would approve the outbuilding on the condition that Johnson agree in writing to "obtain building and water and septic permits for the residential structure no later than October 1, 2016," and "construct the building consistent with written plans provided to the Architectural Review Committee as to design, size, materials and location." (Kolb to O'Connor, Oct. 7, 2015, Ex. P to DSOF.)

On November 9, 2015, Carrie Masquida filed a charge of housing discrimination with the Illinois Department of Human Rights. (Ex. Q to DSOF, at 000264.) It is not clear exactly what prompted Masquida to take action at this time. The Association received notice of the charge on November 10, 2015. (DSOF ¶ 32.) At some point after that, however—neither party says when—Carrie "put a pause on" her charge with the Illinois Department of Human Rights and hired counsel recommended to her by Plaintiff H.O.P.E., Inc. (C. Masquida Dep,. 54; DSOF ¶ 34.)

On May 12, 2016, six months after Carrie filed her administrative complaint, the Architectural Committee published a 13-page document titled "Architectural and Shoreline Standards." (*See* Ex. 24 to PSOF.) The avowed purpose of this "reference guide," as the document described itself, was to "alert" property owners "to many of the common rules and restrictions" contained in the Covenants, and to provide "direction with which to navigate the process." (*Id.* at 3.) In fact, the Standards not only "alert[ed]" property owners to the specific rules and restrictions contained in the Covenants, but also added new rules not mentioned in the Covenants. Among other things, the Standards advised that no outbuilding would be permitted prior to the completion of a residence on the same lot, unless that outbuilding would occupy an area of 200 square feet or less. (*Id.* at 7.) The Standards also stated that "[p]ermitted exterior wall and trim materials for residences include masonry, siding, log, or stucco"; that "[m]asonry may be brick, stone, cultured stone or brick veneer"; that "[s]iding materials shall appear as natural material and shall be wood, engineered wood siding products, cement board, half log, vinyl or aluminum"; and that "[r]oof materials may be asphalt shingles, slate, cedar shingles, or clay tile." (*Id.* at 6.) These and other limitations would apply only to future construction. According to the

11

Standards, "[e]xisting permanent structures that do not conform . . . will be grandfathered, and removal will not be required." (*Id.*) The Standards did not include a similar allowance for persons who had purchased property before the new rules were announced, but had not yet built a structure on that property.

### III. Procedural history

Plaintiffs filed this lawsuit on May 20, 2016, eight days after the Architecture Committee published the Architectural and Shoreline Standards, alleging that Defendants' "intentional discriminatory conduct" violates the Fair Housing Act and the Civil Rights Act of 1866. (*See* Compl. ¶¶ 42-46.) Defendants moved to dismiss, but this court denied the motion because the Complaint alleged facts that, if true, would violate 42 U.S.C. §§ 3604(b) and 3617, as well as 42 U.S.C. § 1982. *See H.O.P.E., Inc. v. Lake Greenfield Homeowners Association*, No. 16 C 5422, 2017 WL 1493708 (N.D. Ill. April 26, 2017).[6] Defendants now request summary judgment in their favor on each of Plaintiffs' claims.

## **DISCUSSION**

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

---

[6] The court also found that Plaintiff H.O.P.E., Inc. has associational standing to bring these claims, *see H.O.P.E., Inc.*, 2017 WL 1493708, at *4, and Defendants do not dispute that conclusion here.

**I.      Racial Discrimination**

Plaintiffs assert theories of intentional racial discrimination under 42 U.S.C. §§ 3604(b) and 3617, as well as 42 U.S.C. § 1982. The latter statute provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Section 3604(b) of the Fair Housing Act makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race, color, religion, sex, familial status, or national origin." Section 3617 of the FHA, as interpreted by the Department of Housing and Urban Development, makes it unlawful to "interfer[e] with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons," 24 C.F.R. § 100.400(c)(2). A "dwelling," as that term is used in the Fair Housing Act, can be "vacant land on which a residence will be constructed." *H.O.P.E., Inc.*, 2017 WL 1493708, at *4; 42 U.S.C. § 3602.

None of the Defendants in this case argue that their actions were outside the scope of sections 3604(b) or 3617.[7] Nor could they. Section 3604(b) addresses discrimination in "sale or rental" of property. If a homeowners association has the authority to enforce restrictions on the purchaser of a dwelling pursuant to the terms of the sale, the association violates section 3604(b)

---

[7] Defendants do argue that their conduct was outside the scope of 42 U.S.C. § 1982, because that statute "reach[es] only race discrimination, not discrimination based on national origin." *Pintea v. Varan*, No. 16-CV-5990, 2016 WL 6877627, at *4 (N.D. Ill. Nov. 22, 2016), *aff'd sub nom. Pintea v. Gurvey*, 692 F. App'x 798 (7th Cir. 2017). It is not clear to the court why this matters here, as the applicable sections of the Fair Housing Act indisputably offer protection from discrimination on the basis of national origin. *See* 42 U.S.C. §§ 3604(b), 3617. Neither party purports to identify the independent significance of section 1982 to this case. But whatever that significance may be, the court notes that Plaintiffs allege discrimination on account of the Hispanic ancestry of themselves and/or their associates, not their Cuban national origin, *per se*. It is well-established that the Congress that enacted section 1982 "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). As explained below, Plaintiffs have presented sufficient evidence of intentional discrimination on the basis of Carrie and Ozzie's Hispanic ancestry to proceed with their claim under section 1982.

13

by adopting discriminatory rules, or enforcing facially neutral rules in a discriminatory fashion. *See Bloch v. Frischholz*, 587 F.3d 771, 780 (7th Cir. 2009) (*en banc*). Such discrimination "flows from the terms of sale," thereby bringing it within the scope of section 3604(b). *Id.* Similarly, as this court explained earlier, an association that "interfere[es] with the process of constructing a residence, or an outbuilding, on vacant land would interfere with the enjoyment of the land," thereby bringing the interference within the scope of section 3617. *H.O.P.E., Inc.*, 2017 WL 1493708, at *6.

Defendants argue instead that Plaintiffs have not presented sufficient evidence of discriminatory intent.[8] In fair housing cases, discriminatory intent can be inferred from evidence such as "suspicious timing, ambiguous statements, [or] behavior toward or comments directed at others in the protected group," as well as "evidence that others similarly situated to plaintiff, other than in the characteristic on which the defendant is forbidden to base a difference in treatment (e.g., race), received systematically better treatment." *Robinson v. Parkshore Co-op*, No. 01 C 2103, 2002 WL 1400322, at *1 (N.D. Ill. June 27, 2002) (Hibbler, J.). Discriminatory intent can also be inferred from evidence that Plaintiffs are members of a protected class, that Defendants knew of Plaintiffs' membership in the protected class, that Defendants denied Plaintiffs a benefit for which Plaintiffs were qualified, and that Defendants' non-discriminatory explanations for the denial (if any) are pretexts for discrimination. *Hamilton v. Svatik*, 779 F.2d 383, 387 (7th Cir. 1985).

Plaintiffs have presented enough evidence to avoid summary judgment. Plaintiffs Ozzie and Carrie Masquida are Hispanic, and a reasonable jury could conclude that Defendants knew they are Hispanic from evidence that Carrie advertised her Cuban ethnicity on the exterior of her car, and that Ozzie interacted with each of the individual Defendants. Plaintiffs Andrew Johnson and Nancy Masquida are white, and Plaintiffs do not suggest that Defendants discriminated

---

[8] Plaintiffs do not allege a disparate impact theory of liability, so the court will not consider it here.

14

against them because they are white, but a reasonable jury could conclude that Defendants were aware that Andrew and Nancy would be living with—or at least associating with—Ozzie and Carrie. Section 3604(b) refers to discrimination "because of race . . . ," not discrimination because of a plaintiff's *own* race, and thus prohibits discrimination against persons because of their association with others of a particular race. *See Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982) ("[T]he imposition upon white tenants of a rule that they may not receive black guests violates the Fair Housing Act."); *Cato v. Jilek*, 779 F. Supp. 937, 939-40 (N.D. Ill. 1991) (Shadur, J.) (landlord violated section 3604 by refusing to rent to a white woman because of her engagement to a black man); *United States v. Hylton*, 944 F. Supp. 2d 176, 188-89 (D. Conn. 2013) (landlord violated section 3604(b) by refusing to permit white tenant to sublet to African-American tenant).

There is no genuine dispute that Defendants denied Plaintiffs the approval they needed to build an outbuilding. Although Defendants offered to approve the outbuilding in October 2015, this offer was not an approval. Instead, it was conditioned on further concessions from Plaintiffs—such as obtaining water and sewage permits for a residence within a designated time period.[9]

Defendants suggest that Plaintiffs were not qualified for approval of their proposed outbuilding because they did not comply with all the conditions imposed on them by the Architectural Committee. But a reasonable jury could conclude otherwise. Nothing in the Covenants explicitly requires a property owner to obtain permits for a residence prior to constructing an outbuilding, or to post a "performance bond" to ensure construction of a residence once the outbuilding is completed. A reasonable jury could conclude that the Covenants did not actually require Plaintiffs to meet these conditions in order to qualify for approval of their proposed outbuilding. That jury could also conclude that Andrew Johnson provided the Architectural

---

[9] Defendants also suggest that their October 2015 offer makes this case "moot," but they do not cite any authority for this position, and the court disagrees. Even if Defendants had approved Plaintiffs' proposal in October 2015, this would, at best, limit the damages Plaintiffs suffered for earlier discriminatory denials.

Committee with sufficient construction plans for the outbuilding, in August and September 2015, to satisfy the conditions that *were* enumerated in the Covenants.

Defendants did offer non-discriminatory rationales for disapproving Plaintiffs' proposed outbuilding. They stated that the proposed outbuilding and residence were "incompatible and not of the same architectural style," that the materials in the proposed outbuilding would not be "consistent with" the materials in the proposed residence, and that the existence of an outbuilding without an accompanying residence on the same lot would reduce surrounding property values. But Plaintiffs have presented evidence that could persuade a reasonable jury that these rationales are pretexts for discrimination. The Committee permitted non-Hispanic property owners, such as Donny Crater, to construct outbuildings that did not match their residences, and to construct those outbuildings prior to approving construction of the residences they would serve. Plaintiffs have also presented evidence that the Committee gave Chuck Rachke permission to build an outbuilding larger than that permitted by the Covenants shortly after it rejected Plaintiffs' proposed outbuilding. A reasonable jury could infer pretext from this evidence of the Committee's laxer enforcement of the Covenants against white property owners in Lake Greenfield Estates.

According to Defendants, that evidence is not sufficient to support an inference of intentional discrimination because the decisions were made by the Committee when it was led by Bertrand Ludden. Ludden was no longer a member of the Committee when it disapproved of Plaintiffs' outbuilding in 2015, Defendants note, so they contend that his approval of other owners' outbuildings says nothing about the motivations underlying a decision made by Chuck Rachke, Scott Henderson, and Dean Cunning. In support of their position, Defendants cite an employment-discrimination case, *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826-27 (7th Cir. 2008), in which an employer claimed it fired the plaintiff, an African-American manager, for having a sexual relationship with a white hourly employee, in violation of the company's (presumably race-neutral) anti-fraternization policy. The plaintiff presented evidence that certain other managers who had had *intra*racial relationships with hourly employees received more

16

favorable treatment. But the Seventh Circuit concluded that at least some of these managers were not similarly situated to the plaintiff, because the persons who decided not to fire them were not involved in the decision to fire the plaintiff. *See id.* at 826-27. "Different decisionmakers," the court explained, "may rely on different factors when deciding whether, and how severely, to discipline an employee." *Id.* at 826.

This case is distinguishable from *Ellis*. For one thing, Plaintiffs have presented evidence that they informed Henderson, Rachke, and Cunning, on several occasions, about Ludden's previous approvals of non-conforming outbuildings on lots where a residence had not yet been constructed. There is no evidence that Henderson, Rachke or Cunning told Plaintiffs that the Association's enforcement policy had changed. Indeed, Defendants have offered no explanation at all for choosing to enforce the Covenants more rigidly than Ludden did in these instances. *Cf. McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (finding that two individuals with different supervisors were similarly situated for purpose of employment discrimination claim, because persons who subjected plaintiff to harsher discipline "were well-aware of the discipline meted out to past violators"); *Seay v. Tennessee Valley Authority*, 339 F.3d 454, 479-80 (6th Cir. 2003) (noting that "the 'same supervisor' criterium [sic] has never been read as an inflexible requirement," and is "particularly problematic" in circumstances "where a violation . . . does not occur frequently enough to invite such a direct comparison"). In any event, Rachke himself constructed a garage, in 2016, that was larger than the maximum size indicated in the Covenants, and presumably obtained permission to do so from the same Committee that disapproved Plaintiffs' proposal for an outbuilding. A reasonable jury could conclude from this evidence that Defendants "did not believe the reasons [they] gave for [their] action" in September 2015, *McCoty v. Maytag Corp.*, 495 F.3d 515, 522 (7th Cir. 2007), and that those reasons were pretexts for discrimination.

Because Plaintiffs have presented sufficient evidence from which a reasonable jury could find in their favor on their claims of intentional racial discrimination under 42 U.S.C. §§ 3604(b)

and 3617, as well as under 42 U.S.C. § 1982, Defendants' motion for summary judgment is denied with regard to those claims.

**II.     Retaliation**

Plaintiffs also alleged that Defendants retaliated against them for engaging in conduct protected by the Fair Housing Act and/or section 1982. On this claim, the evidence is much thinner. Plaintiffs cite only the fact that on May 12, 2016—more than six months after Carrie Masquida filed her complaint with the Illinois Department of Human Rights and one week before Plaintiffs filed the complaint in this court—the Architectural Committee adopted the new "Architectural and Shoreline Standards." In support of their theory that the Standards were adopted to punish Plaintiffs for Carrie's charge of discrimination, Plaintiffs point out that the Standards prohibit the construction of outbuildings with the very type of materials Plaintiffs hoped to use for their outbuilding, as well as the construction of outbuildings prior to the construction of residences, but do not require the demolition of existing non-conforming structures. These are the same prohibitions Defendants articulated in their disapproval of Plaintiffs' proposed outbuilding in September 2015. A reasonable jury could find that this disapproval was racially discriminatory, as explained above. But that jury could not find that the act of codifying the rules purportedly justifying that disapproval was retaliatory, as it is entirely consistent with the positions Defendants took *before* Plaintiffs engaged in protected conduct. Defendants' motion is granted with regard to Plaintiffs' retaliation claims under sections 3617 and 1982.

## **CONCLUSION**

Defendants' motion for summary judgment [61] is granted in part and denied in part. The motion is granted with regard to Plaintiffs' retaliation claims in counts III and V of their Amended Complaint, because Plaintiffs have not presented any evidence of actionable retaliation. The motion is denied with regard to Plaintiffs' claims of intentional discrimination in counts I, II, and IV

of their Amended Complaint. A status conference is set for August 13, 2018, at 9:00 a.m. The parties are encouraged to discuss settlement.

                                                ENTER:

Dated: July 31, 2018

                                          REBECCA R. PALLMEYER
                                          United States District Judge